**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| MICHAEL ERIC MIAL,<br><br>Plaintiff,<br><br>vs.<br><br>JERRY R. FOXHOVEN, et al.,<br><br>Defendants. | No. C17-4007-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |

_____

## I.   INTRODUCTION

This case is before me on a motion (Doc. No. 26) for summary judgment filed by defendants Jerry Foxhoven, in his official capacity as Director of the Iowa Department of Human Services, Richard Shults, in his official capacity as Administrator of the Division of Mental Health and Disability Services, Cory Turner, in his individual capacity and in his official capacity as Superintendent of the Civil Commitment Unit for Sexual Offenders (CCUSO), Brad Wittrock, in his individual capacity and in his official capacity as Deputy Superintendent of CCUSO, and Dan Pingel, in his individual capacity and in his official capacity as Treatment Program Supervisor at CCUSO. Plaintiff Michael Eric Mial (Mial) has filed a resistance (Doc. No. 29) and defendants have replied (Doc. No. 30). I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c).

## II.   PROCEDURAL HISTORY

Mial commenced this action by filing a complaint (Doc. No. 2) on January 23, 2017. The complaint included several constitutional claims and claims under federal and Iowa law against various state employees. All of the claims relate to an allegation of

unlawful discrimination on the basis of religious beliefs, allegedly culminating in the termination of Mial's employment at CCUSO.

Defendants responded with a pre-answer motion (Doc. No. 8) to dismiss for failure to state a claim, which I granted in part and denied in part. *See* Doc. No. 19. Counts VI and XI were dismissed in their entirety, as was Mial's request for declaratory relief. Certain other claims were dismissed in part.

Defendants filed an answer (Doc. No. 20) on November 20, 2017, denying all remaining claims. Defendants then filed their motion for summary judgment on February 16, 2018. In his resistance, Mial states that he "does not resist entry of summary judgment with respect to all claims other than his religious discrimination claims under Title VII and the Iowa Civil Rights Act (Counts VII and VIII of the Complaint)." Doc. No. 29 at 1. Thus, Counts VII and VIII of the complaint set forth the only claims that remain for consideration.[1]

### III.  RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

Mial applied for and was awarded the position of Psychiatric Security Specialist (PSS) at CCUSO. His first day of work was December 7, 2015. Doc. No. 26-3 at 44, 165. State employees, including Mial, are considered probationary for the first six months of employment. *Id.* at 8, 58. The PSS position involves working directly with

---

[1] As I noted in my previous order, Count VIII (religious discrimination under Title VII) is cognizable only against an employer, not against individual employees. Doc. No. 19 at 23. Mial has not named his actual employer as a defendant but has sued Foxhoven and Shults in their official capacities. In seeking summary judgment as to Count VIII, defendants do not contend that naming Foxhoven and Shults in their official capacities is insufficient for purposes of a Title VII claim. As such, for purposes of the pending motion I will assume that Mial has directed his Title VII claim against the appropriate parties.

CCUSO patients,[2] as set out in the position description questionnaire. *Id.* at 7, 165-69. Among other things, a PSS employee: "[p]rovides care and treatment of patients by implementing program policies," "[p]erforms essential security functions, such as conducting unit counts and security checks and maintaining order and discipline on the unit," "[o]bserves and accurately documents information relating to each patient," "[a]ttends treatment team meetings" and "[f]ollows written and supervisory directives, personnel policies, and departmental policies." *Id.* at 165-66.

After a probationary employee has worked for six months, CCUSO supervisors must decide whether to retain or discharge the employee. Factors considered in this decision include how the probationary employee engaged with patients and other employees, as well as the employee's ability to follow work rules, policies and supervisory directives. *Id.* at 58. CCUSO employees are required to follow work rules, including those applicable to the use of employee email accounts.[3] *Id.* at 58, 166.

Mial sent 49 emails using his CCUSO email account between December 22, 2015, and April 27, 2016. *Id.* at 87-153. These emails discussed administrative matters (*id.* at 87, 89-90, 92-98, 104-05, 114-18, 142, 144), scheduling issues (*id.* at 88, 99-102, 106, 119-25, 127, 130-39, 143, 148-53), and personal matters (*id.* at 91, 126, 128). On two occasions, Mial used his CCUSO email account to forward incident reports about CCUSO patients to the next shift of employees. *Id.* at 140, 145. Beginning March 5, 2016, Mial signed the majority of his emails sent through his CCUSO email account with

---

[2] Patients at CCUSO have completed a term of imprisonment following conviction for a violent sexual offense, but in a separate civil proceeding have been found likely to commit further violent sexual offenses. As such, CCUSO is a secure facility which employs a mix of security and treatment personnel. *Civil Commitment Unit for Sexual Offenders*, Iowa Department of Human Resources, hhtp://dhs.iowa.gov/mhds/mental/in-patient/ccuso.

[3] Neither party has submitted a CCUSO policy or directive related to regulating CCUSO email accounts, beyond an April 12, 2016, email that will be discussed further below.

3

the valediction "In Christ." *Id.* at 120, 123-53. The two emails containing patient information also included the valediction "In Christ." *Id.* at 140, 145.

Mial admits that he first used "In Christ" in his CCUSO email signature on March 5, 2016. Doc. No. 29-3 at 2 (¶ 12). He has not explained why he did not use that phrase before that date, or why he began doing so on that date. *See, e.g.,* Doc. No. 26-3 at 209. Mial has stated, however, that he uses the "In Christ" valediction for the purpose of proclaiming his faith in all he does. Pastor Steve Britton of Cavalry Baptist Church in Estherville, Iowa, testified that while Mial is not a member of his church, he and his family have attended services at the church "probably half a dozen times total." *Id.* at 34. Pastor Britton testified that members of his church believe that they are to "give out the gospel" and that his church "normally tr[ies] to train people to go out and knock on doors, give out gospel, give the gospel message." *Id.* at 34-35. When asked whether it would be necessary to use "In Christ" in a work email to proclaim one's faith, Pastor Britton responded:

> A: It would be up to the boss.
>
> Q: Okay.
>
> A: You know. It—whatever—whatever the company policy is. If they tell you not to do it, then you don't do it. You know, we're to—we're to obey the authorities over us.
>
> Q: And that would include the employer?
>
> A: Yeah.

*Id.* at 35. Pastor Britton also testified that there are "several ways" available for followers to proclaim their faith to others. *Id.*

Mial's valediction came to the attention of his supervisors in April 2016. Turner emailed Wittrock regarding the use of the "In Christ" valediction on an email containing a patient incident report. *Id.* at 176. Turner testified that he made this decision because he thought the valediction "could potentially be an issue." *Id.* at 65. Specifically, Turner thought that the valediction implicated issues of keeping church and state separate, and

promoting one specific religion over another. *Id*. Turner testified that CCUSO policy directly addressed this issue, which he considered to be rules governing "the use of e-mail in a professional fashion."[4] *Id*. at 66.

On April 11, 2016, Wittrock asked Pingel, Mial's direct supervisor, to address Mial's valediction. *Id*. On April 12, 2016, Wittrock sent an email memorandum to all staff at CCUSO stating: "Email signatures need to contain business related information only and employees shall not include any personal messages." *Id*. at 177. While other staff stopped using non-business-related email signatures, Mial continued to use the "In Christ" valediction. *Id*. at 84. On April 20, 2016, Pingel and Mial met to discuss Mial's non-compliance with the email signature rule. At this meeting, Mial requested to keep his email without any changes. *Id*. at 82. Pingel testified that Mial did not explain in great detail why he wished to keep using the valediction, stating only that "religion should be in every component of your life or something to that extent." *Id*. at 82. Pingel's notes from that meeting state:

> PSS Mial . . . explain[ed] that his religious views were so important to him, that he cannot separate business from religious views . . . .
>
> PSS Mial explained that he anticipated that supervisory staff would eventually speak with him about the "In Christ" signature line. Mial remarked "fire me if you have to, I am not removing it." PSS Mial stated further that he has already discussed the potential ramifications of this decision with his wife, and he is willing to "accept the consequences."

*Id*. at 179.

After the April 20, 2016, meeting, Turner and Wittrock consulted with Janelle Bertrand, a human resources employees from the Iowa Department of Administrative Services (DAS) as to how they should resolve Mial's failure to follow supervisory directives. *Id*. at 50-51, 177. On April 21, 2016, Wittrock sent a follow-up email to all

---

[4] Again, no actual, written policy has been provided to the court.

staff repeating the directive to refrain from inserting personal messages in their email signatures. *Id.* at 178.

On April 28, 2016, Mial had a second meeting with Turner and Wittrock to discuss his non-compliance with the email signature rule. Mial secretly recorded the audio of this meeting on his cell phone. *Id.* at 14 (the recording has been provided to the court on a DVD-R disc). During this meeting, Turner and Wittrock explained the purpose of the email policy (keeping personal lives and business separate), as well as the importance of CCUSO employees following supervisory directives. Recording at 1:00-1:48. Further, they explained their belief that all email at CCUSO was potentially subject to a discovery or an open records request. During this meeting, Mial explained that his use of the valediction was a result of his strong religious beliefs, as he used the valediction to proclaim his faith. *Id*. at 2:19-2:32. Mial did not request or propose any accommodations and stated simply that he would continue to use the valediction. *Id*. at 4:12-18.

Mial repeated his earlier statement that he understood that his position may cost him his job (*id.* at 4:25-30) and asked whether he needed to turn in his keys now (*id.* at 6:28-39). The parties appear to have left this meeting with the understanding that Mial would be discharged if he did not comply with the email signature rule and, in fact, Mial's employment ended that day. Doc. No. 26-3 at 180. Mial filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the Iowa Civil Rights Commission (ICRC) approximately two weeks after he was fired. *Id.* at 183-84.

Mial testified that he essentially has not worked since he was discharged from CCUSO, barring a brief stint at Life Connections, a family counseling center in Marshalltown, Iowa. Doc. No. 26-3 at 6, 17, 22-27, 184-200. Mial testified that he was discharged from Life Connections because they refused to accommodate his request to use the same "In Christ" valediction in his email. *Id*. at 6. However, email communications between Mial and various employees at Life Connections indicate that the disagreement may have been more complicated. *Id*. at 184-200. Currently, Mial

spends his time as a volunteer firefighter and attending online classes in furtherance of a Ph.D. in Emergency Management. *Id.* at 4. Mial still uses "In Christ" to sign emails for school or other purposes, but he does not use "In Christ" when he authors papers for school or on other forms that do not have a signature block. *Id.* at 17-18.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526,

531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id*. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id*. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## IV. DISCUSSION

As noted above, Mial does not resist the entry of summary judgment as to all remaining claims other than his religious discrimination claims under Title VII and the

ICRA, which are set forth in Counts VII and VIII. As such, I will grant defendants' motion for summary judgment on Counts I, II, III, IV, V, IX, and X.

Count VII alleges religious discrimination against the individual capacity defendants (Wittrock, Pingel and Turner) in violation of the Iowa Civil Rights Act (ICRA), while Count VIII alleges religious discrimination in violation of Title VII against the defendants in their official capacities. The basis for both claims is the defendants' alleged failure to accommodate Mial's preferred email valediction.

### A. *Religious Discrimination Standards*

Federal and state laws forbid an employer from discriminating against an employee because of that employee's religion. *See* 42 U.S.C. § 2000e-2(a)(1), (j); Iowa Code § 216.6(1)(a). In the context of a Title VII claim, the Eighth Circuit Court of Appeals has explained:

> To establish a prima facie case of religious discrimination, a plaintiff must show he (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of such conflict, and (3) suffered an adverse employment action.

*Ollis v. HearthStone Homes, Inc.*, 495 F.3d 570, 575 (8th Cir. 2007) (citing *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000) (per curiam)). If the plaintiff establishes a prima facie case, then "the burden shifts to the employer to produce evidence showing that it can not reasonably accommodate the employee without incurring undue hardship." *Cook v. Chrysler Corp.*, 779 F. Supp. 1016, 1022 (E.D. Mo. 1991), *aff'd*, 981 F.2d 336 (8th Cir. 1993), *cert. denied*, 508 U.S. 923 (1993). "Determinations of what constitutes an 'undue hardship' must be made on a case-by-case basis." *Harrell v. Donahue*, 638 F.3d 975, 979 (8th Cir. 2011) (citing *Brown v. Polk Cnty.*, Iowa, 61 F.3d 650, 655 (8th Cir. 1995) (en banc)). In *Harrell*, the Eighth Circuit noted that an accommodation that violates a collective bargaining agreement imposes an undue hardship. 638 F.3d at 980.

The court also explained that any accommodation that "causes more than a de minimis impact on co-workers" creates an undue hardship. *Id*. (citing *Brown*, 61 F.3d at 655).

The Iowa Supreme Court has adopted the Title VII analysis for religious discrimination claims arising under the Iowa Civil Rights Act. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983).

### B. *Analysis*

Defendants contend they are entitled to summary judgment because Mial has failed to establish the first two elements ("sincerity" and "notice") of his prima facie case. They also argue that even if Mial can establish a prima facie case, CCUSO could not have accommodated his desired valediction without violating the First Amendment's Establishment Clause. I will address these issues separately.

#### 1. *Sincerity*

Defendants argue that Mial has failed to make the required prima facie showing of discrimination because his use of the email valediction is merely a personal preference that is not sincerely connected to religion. *Brown*, 601 F.2d at 960 (Title VII "does not require an employer to reasonably accommodate the purely personal preferences of its employees."). In support of this argument, defendants point to the following facts: (1) Mial did not use this valediction during his first three months of employment with CCUSO, (2) Mial provided no explanation as to why he started using it and (3) Mial does not use the valediction on all documents or communications. Further, defendants note that the pastor of the church Mial occasionally attends testified that the use of the valediction is not required and that there are several other ways for followers to proclaim their faith.

Title VII protects "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). In considering whether a particular practice or belief of an employee is covered by Title VII, a court may neither determine what the tenets of a

particular religion are, nor determine whether a particular practice is or is not required by the tenets of the religion. *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) ("it is no business of courts to say . . . what is a religious practice or activity"); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). However, because employers are not required to accommodate purely personal preferences, "the court [is] allowed, at a minimum, to ascertain whether the practice asserted by the plaintiff is purely personal, or does indeed have some connection with the plaintiff's religion." *Vetter v. Farmland Indus., Inc.*, 884 F. Supp. 1287, 1307 (N.D. Iowa 1995), *rev'd on other grounds*, 120 F.3d 749 (8th Cir. 1997). The two issues are not strictly tied together. Thus, the fact that a practice or belief may be connected to religion does not compel the conclusion that it is not a personal preference, or that it is in fact sincerely held. *See, e.g., Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682-83 (9th Cir. 1998) (timing of religious pilgrimage was a matter of personal preference, although need to attend pilgrimage was certainly a sincerely held religious belief); *Vetter*, 120 F.3d at 752 (because there was evidence that the plaintiff chose to live in Ames as a matter of personal preference, rather than in compliance with a practice of his religion to live in an active Jewish community with a synagogue, it was for the jury to resolve whether the religious belief was sincerely held).

Here, the undisputed facts establish that Mial's practice of signing his emails with the valediction "In Christ" was connected with Mial's religious belief that he must proclaim his faith in everything he does. However, the sincerity issue is less clear. As noted above, there is evidence in the record that the practice was merely a personal preference. For example, Mial began using the valediction during his third month of employment, he has not explained why he did not use it before that point, he does not use it in instances in which he signs his name and his pastor testified that the email valediction is not required. Further, there is some evidence that Mial began using the email valediction with the expectation that it would lead to discharge and, potentially, a lawsuit.

Despite the fact that there is some evidence casting doubt on the issue of sincerity, I am unable to resolve this issue as a matter of law. Mial's testimony concerning his faith and his commitment to proclaiming Christ in everything he does is sufficient to raise a jury question as to whether his use of the valediction "In Christ" was sincerely connected to religion. As such, defendants are not entitled to summary judgment on this basis.

### 2. *Notice*

Defendants argue that they are entitled to summary judgment because Mial did not provide sufficient notice to trigger their duty to accommodate. Specifically, defendants state: "Mr. Mial did assert that he wanted to continue to use the email sign off, but he never explained how it fit in with his religious practice. Mr. Mial did not explore alternatives or even request that alternatives be explored." Doc. No. 30 at 3.

The notice requirement is not particularly stringent, as it requires "only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements." *Vetter*, 864 F. Supp. at 1308 (citing *Heller*, 8 F.3d at 1439). The undisputed evidence indicates that Mial informed CCUSO that his email valediction was connected to his religious beliefs. For example: (1) Pingel's notes from the April 20, 2016 meeting indicate that Mial stated his religious beliefs were so important to him that he could not separate them from business and (2) during the April 28 meeting with Turner and Wittrock, Mial stated that the email valediction was his way of proclaiming his faith in everything he does. As such, I am unable to conclude that Mial failed to provide sufficient notice as a matter of law.

### *3. Accommodation*

Finally, defendants argue that even if Mial can establish a prima facie case of religious discrimination, they could not offer a reasonable accommodation without violating the Establishment Clause. As I wrote previously in this case:

> Although the defendants' obligations under the Establishment Clause are relevant in determining whether accommodating Mial would result in hardship, a talismanic invocation of the Establishment Clause is not sufficient at this stage of the case to resolve the claim on a motion to dismiss. *See* [*Brown v. Polk Cnty*, 61 F.3d 650, 659 (8th Cir. 1995)] ("The defendants would have us hold that their 'interest' in avoiding a claim against them that they have violated the establishment clause allows them to prohibit religious expression altogether in their workplaces. Such a position is too extravagant to maintain . . . .").
>
> \*\*\*
>
> Employers are not required to accommodate every religious activity. In some situations, religious expression in the workplace can conflict with employer policies aimed at curbing speech in the workplace that could disrupt or offend coworkers. A plaintiff does not establish a Title VII claim if he or she refuses to comply with a generally applicable rule or procedure. *See, e.g., Walden v. Ctrs. for Disease Control and Prevention*, 669 F.3d 1277 (11th Cir. 2012) (EAP counselor could not establish prima facie religious discrimination claim when she was terminated after refusing to counsel LGBT co-workers due to her religious beliefs); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (employer not required to accommodate plaintiff's anti-gay and lesbian views in the workplace by allowing employee to post discriminatory posters or removing its own anti-discrimination posters). Government employers do not violate Title VII's provisions by preventing religious use of government time or resources. *See, e.g., Brown*, 61 F.3d at 655-56. An employer may prevent an employee from proselytizing if the employee's actions disrupt business, alienate customers or are contrary to a state employer's policy of not endorsing religion. *See, e.g., Daniels*, 246 F.3d at 504 (state need not accommodate request to wear a cross pin on exterior of police officer's uniform); *Baz v. Walters*, 782 F.2d 701 (7th Cir. 1986) (state employer need not accommodate chaplain counselor's religion by changing policy to allow religious counseling techniques); *Spratt v. Cnty. of Kent*, 621 F. Supp. 594 (W.D. Mich. 1985).

Doc. No. 19 at 21-22.

Defendants have submitted evidence to suggest that at least some emails sent by CCUSO employees are subject to discovery and open records requests. Also, while no written policies have been provided, deposition testimony suggests that CCUSO maintains relevant policies about professionalism in the workplace and work emails, as well as respecting coworkers' and patients' rights. However, there is scant evidence that Mial's use of "In Christ" at the end of work-related email messages (such as in various requests for shift changes or time off) would lead the public to assume CCUSO was endorsing a religion. Nor have defendants come forward with conclusive evidence that incident reports of the type Mial sent on April 9, 2016, and April 20, 2016, are frequently discoverable and are likely to be interpreted as CCUSO endorsing Christianity.

Thus, defendants have not shown as a matter of law that the Establishment Clause prevented them from offering an accommodation. Nor have they demonstrated, as a matter of law, that Mial's email valediction caused any disruption in the workplace or violated any neutral, generally applicable rules or procedures. Of course, the jury could decide that Mial's use of the valediction violated neutral policies about professional conduct and following supervisory directives. If so, then a duty to accommodate may not apply. However, I am not able to reach such a conclusion as a matter of law. Defendants' motion for summary judgment must be denied.

## V. CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment (Doc. No. 26) is **granted** in part and **denied** in part, as follows:

1. The motion is **granted** as to Counts I (Free Speech), II (Free Association), III (Free Exercise), IV (Establishment Clause), V (Procedural Due Process), IX (ICRA Retaliation) and X (Title VII Retaliation). Those claims are **dismissed**.

2. The motion is **denied** as to Counts VII (ICRA Religious Discrimination) and VIII (Title VII Religious Discrimination). Trial on those two counts will proceed as scheduled beginning January 14, 2019.

**IT IS SO ORDERED.**

**DATED** this 4th day of April, 2018.

_____
Leonard T. Strand, Chief Judge